UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DUSTIN F. GAPEN**                                     Case Number 3:13 CV 2689

    Plaintiff,                                              Magistrate Judge James R. Knepp II

    v.                                                     MEMORANDUM OPINION AND
                                                           ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

## INTRODUCTION

Plaintiff Dustin Gapen filed a Complaint seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplement security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the Court affirms in part and remands in part the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

On September 14, 2010, Plaintiff filed for DIB, alleging disability beginning May 22, 2010. (Tr. 198-204). On October 7, 2010, Plaintiff filed for SSI, also alleging disability beginning May 22, 2010. (Tr. 205-210). Plaintiff's claims were denied initially (Tr. 135-41), and upon reconsideration (Tr. 144-49). Plaintiff filed a written request for a hearing on June 7, 2011. (Tr. 150). On August 30, 2012, Plaintiff (represented by counsel) and a vocational expert ("VE") testified at a hearing, after which Plaintiff was found not disabled. (Tr. 44-81). The Appeals Council denied review of the ALJ's decision on November 15, 2013, rendering the ALJ's

1

decision the final decision of the Commissioner. (Tr. 1-7); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On December 5, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

*Plaintiff's Testimony and Vocational Background*

Plaintiff testified that he lived alone at the time of the hearing. (Tr. 71). He attended school through the twelfth grade and was employed until about May 22, 2010, when he left work due to his impairments. (Tr. 71). He did attempt to return to factory work in 2011, but that lasted only four days. (Tr. 71). Plaintiff testified he treated with Susan Whittaker, NP, most frequently and had been treated at Neighboring, once every two weeks for approximately two years. (Tr. 72). He listed his current medications as Abilify, Lamictal, and Zoloft. (Tr. 72). Despite this medication, Plaintiff experienced symptoms of mania, hyperactivity, and difficulty concentrating on ideas or thoughts. (Tr. 72-73).

In response to his counsel's questioning, Plaintiff described difficulty sleeping, explaining that he had episodes in which he did not feel tired and stayed up all night. (Tr. 73). Plaintiff recalled his most recent episode, from the week before, in which he was awake for approximately 32 hours, during which he cleaned, played video games, and paced. (Tr. 73). He said when he finally did get to sleep after one of these episodes; he would sleep for about a day and half. (Tr. 73). According to Plaintiff, he suffered from these sleep episodes as frequently as seven times a month. (Tr. 74).

Plaintiff testified he lived at his parent's house but visited his girlfriend's house, where his daughter lives, approximately five days a week. (Tr. 77). He described a typical day as getting his daughter off to school and cleaning the house. (Tr. 78). Plaintiff indicated his girlfriend did the grocery shopping and he did chores around the house, but described having

days in which he did not do anything, felt depressed and unmotivated, and slept all day. (Tr. 78). He said he did not get along well with others who were not family members or his girlfriend (Tr. 78).

*Medical Evidence*

On July 21, 2010, Plaintiff was admitted to the Lake Health Emergency Department complaining of visual hallucinations and presenting symptoms of agitation, anxiety, and depression. At the hospital, Plaintiff was threatening, disruptive, and reported abusing alcohol and marijuana. (Tr. 327). Plaintiff underwent a CT scan of his head, which was negative, and was transferred to Windsor Laurelwood Centers. (Tr. 311-25).

From July 21, 2010 through August 6, 2010, Plaintiff remained at Laurelwood. (Tr. 327). A discharge summary completed by Michael Ray, M.D., on August 11, 2010, reflected that Plaintiff was initially agitated, hostile, uncooperative, disruptive, and destroyed a sink. (Tr. 327). Plaintiff was medicated with Haldol and lithium and stabilized. (Tr. 327-29). Plaintiff's diagnosis on discharge was Bipolar Disorder type I and he was assessed a Global Assessment of Functioning ("GAF") score of 45 to 50[1]. (Tr. 327-29).

On August 11, 2010, Plaintiff was hospitalized at University Hospitals Case Medical Center after his family reported he had been drowsy since being discharged from Laurelwood, had only gotten up from sleeping to eat, had not showered for more than a week, and had "waxy flexibility of extremities." (Tr. 341, 344). Plaintiff's EKG and MRI were unremarkable and his drug screens were negative. (Tr. 342). Plaintiff's Haldol medication was discontinued, his

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *Id.* at 34.

lithium dosage was decreased, and he was started on Ambien and Benadryl for sleep. (Tr. 342). At the time of his discharge on August 13, 2011, he was in good condition. (Tr. 342).

The record also contains treatment records which reflect Plaintiff regularly treated with psychiatrist Ellen M. Kilmartin, M.D., from September 16, 2010 through June 1, 2011. (Tr. 372-97). Dr. Kilmartin's early diagnoses included bipolar disorder, anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), and alcohol and marijuana abuse, early remission. (Tr. 397). The treatment notes from Dr. Kilmartin reflect that his mood, sleep, irritability, and energy had improved with medication. (Tr. 372-97). During Plaintiff's most recent treatment session with Dr. Kilmartin in June 2011, he reported doing odd jobs, having mood swings, and being sober. (Tr. 372-73). Plaintiff was discontinued on Seroquel XR and his diagnosis consisted only of Bipolar disorder. (Tr. 372-73).

From July 15, 2011 through May 18, 2012, Plaintiff regularly treated with Ms. Whittaker. (Tr. 440-46, 455-68).[2] The treatment records reflect Plaintiff's symptoms were fairly stable during appointments in 2011, but worsened in early 2012. (Tr. 440-46, 455-68). During treatment on January 20, 2012, Plaintiff reported experiencing increased depression, anger, feeling edgy, sleeping more, and having suicidal ideations two days during the previous week. (Tr. 461-64). Throughout the remainder of 2012, Plaintiff continued to report hypomanic symptoms, irritability, anger, rigid thought process, low motivation, and negative thought

---

2. The Court recognizes Plaintiff has submitted additional treatment records from Ms. Whittaker, episode notes from Ms. Tracy Fillipasic, PCC-S, and an Assessment of Ability To Do Work-Related Activities (mental) rendered by Ms. Whittaker and Dr. Martin dated July 12, 2013, which are included in the record, but were submitted after the ALJ's decision in this case and not made part of the record by the Appeals Council. (Tr. 6; 18-39). The Sixth Circuit "has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)(citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996)).

processes. (Tr. 457-68). During treatment on June 1, 2012, Plaintiff reported an incident in which he drank too much, had an angry outburst, and broke his girlfriend's cell phone. (Tr. 465-66).

*Opinion Evidence*

On August 25, 2010, Dr. Kilmartin completed a Mental Functional Capacity Assessment on a form provided by the Ohio Department of Job and Family Services. (Tr. 356-58). She opined that Plaintiff had moderate limitations in his ability to remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, and to be aware of normal hazards and take appropriate precautions. (Tr. 356). Dr. Kilmartin assessed Plaintiff with marked limitations in his ability to carry out detailed instructions, sustain an ordinary routine without special supervision, and to set realistic goals or make plans independently of others. (Tr. 356). Plaintiff had extreme limitations in his ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and punctuality within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and travel in unfamiliar places or use public transportation. (Tr. 356). Dr. Kilmartin supported her assessment by noting Plaintiff had a history of at least eight previous manic or hypomania episodes since age 21, had an inability to sleep, was easily irritable, had a temper from working excessively, had episodes of domestic violence when manic, and had been jailed and previously hospitalized. (Tr. 357). Dr. Kilmartin opined Plaintiff was unemployable and his limitations were

5

expected to last more than 12 months. (Tr. 357). Dr. Kilmartin's primary diagnoses for Plaintiff reflects bipolar disorder, type I, most recent episode manic, her secondary diagnosis indicates anxiety not otherwise specified, and alcohol and marijuana abuse. (Tr. 358).

On July 6, 2010, Susan Hayes, PCC, completed an Adult Diagnostic Assessment for Plaintiff, which notes he had recently been fired from his landscaping construction job and was feeling anxious, depressed, angry, and using alcohol and marijuana. (Tr. 360-71). Since losing his job, Plaintiff had been arrested for disorderly conduct while drinking, theft from Wal-mart, and domestic violence. (Tr. 369). Plaintiff's mental status assessment indicated he was well groomed, alert and oriented. (Tr. 368). He reported auditory and visual hallucinations and illusions and some paranoia, but denied current manic symptoms. (Tr. 368). The initial diagnosis was major depression, recurrent, severe with psychotic features, and he was assigned a GAF score of 50.[3] (Tr. 370).

On November 29, 2010, state agency psychologist Robelyn Marlow, Ph.D., reviewed the evidence relating to Plaintiff's disability application. (Tr. 97-100). Dr. Marlow opined Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, or pace, and one or two episodes of decompensation. (Tr. 97-98). On March 31, 2011, another state agency medical consultant Steven J. Meyer, Ph.D., affirmed Dr. Marlow's findings. (Tr. 119-22).

On January 17, 2012, Ms. Whittaker and Ruth Martin, M.D., rendered an Assessment of Ability To Do Work-Related Activities (Mental), concerning Plaintiff and opined he had mild limitations in understanding, carrying out, and remembering instructions, responding appropriately to co-workers, and performing complex, repetitive, or varied tasks; moderate

---

3. *See DSM-IV-TR*, *supra*, note 1.

limitations in responding appropriately to changes in the work setting, using good judgment, and behaving in an emotionally stable manner; and marked limitations in responding appropriately to supervision, and responding to customary work pressures. (Tr. 450-51). The form reflects that Plaintiff had not undergone a psychological evaluation because this was not routine procedure especially since he had no insurance or income. (Tr. 451). Plaintiff's diagnoses included bipolar disorder I with psychotic features, anxiety disorder, and alcohol dependence in full sustained remission. (Tr. 451). Ms. Whittaker opined that Plaintiff's condition was likely to deteriorate if placed under the stress of a job and he would miss approximately one day of work a month due to his impairments or treatment, and if granted disability, he would be unable to manage his own benefits. (Tr. 451). The comments noted Plaintiff's condition was marginally stable without the added stress of employment or school and that his prognosis for work would be limited to part-time employment. (Tr. 451).

*VE Testimony*

The VE testified that Plaintiff's past employment fell into the category of landscape laborer. (Tr. 79). The ALJ then asked the first of three hypothetical questions:

> Hypothetical one is an individual with no exertional restrictions but does have moderate limits in work with supervisors, coworkers and the public, where moderate means there is more than a slight limitation in the area, but the individual is able to function satisfactorily (INAUDIBLE) frequently. Also moderate in maintaining attention and concentration for extended periods. Work at (INAUDIBLE) pace and adapt to change in a routine work settings. Would a person with those limitations be able to do the claimant's past relevant work?

(Tr. 79-80). The VE responded affirmatively, indicating that a person with such limitations would be able to perform Plaintiff's past work. (Tr. 80).

The ALJ's second hypothetical question was as follows:

7

> Hypothetical two is an individual again with no exertional restrictions but does have, let's say all the same moderate limits I gave you in hypothetical one, unless I, unless I increase them. And I'm going to increase the one on works with supervisors, accepting instructions and criticism from moderate to marked. And one more moderate limitation in behaving in an emotionally stable manner and add a mile [sic] limitation in sustaining an ordinary routine without special supervision, where mild means there's a slight limitation in this area but the individual can generally function satisfactorily. Let's add one more mild restriction in understand, remember and carryout [sic] simple instructions. One more moderate in (INAUDIBLE) simple decisions. And add two marked limitations, one in work production, rate and pace and one in responding appropriately to work pressures where marked means there's a serious limitation in this area with substantial loss [sic] the ability to function effectively. And marked in (INAUDIBLE) occasionally. Would a person with those limitations be able to do the claimant's past relevant work?

(Tr. 80). In response, the VE indicated that a person with the hypothetical limitations would not be able to perform the Plaintiff's past relevant work. (Tr. 80). The ALJ followed up the VE's response by asking, "[w]ould a person with those limitations in the age range of 27 to 29, with a twelfth grade education with past relevant work as you testified to, be able to do other work?" (Tr. 80). The VE replied to the ALJ's question in the negative; a person with such limitations would not be able to perform other work. (Tr. 80).

*ALJ's Decision*

On September 27, 2012, the ALJ issued his decision, in which he found Plaintiff had the severe impairment of bipolar disorder. (Tr. 52). The ALJ then found Plaintiff's impairments considered singly and in combination did not meet or equal a listed impairment. (Tr. 52-53). Next, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform less than a full range of work at all exertional levels. (Tr. 54). He determined Plaintiff was moderately limited in his ability to accept instruction and criticism from supervisors, work with co-workers and the public without distracting them or exhibiting behavioral extremes, maintain attention and concentration for extended periods, work at a production rate pace, maintain attendance, be

8

punctual, take usual breaks, and adapt to change in the routine work setting. (Tr. 54). The ALJ found, based on Plaintiff's vocational background, RFC, and the VE testimony, Plaintiff could still perform his past relevant work as a landscaper. (Tr. 56). Thus, the ALJ found Plaintiff was not disabled. (Tr. 56).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff asserts the ALJ's decision is not supported by substantial evidence and alleges the ALJ: (1) did not follow the treating physician rule in evaluating the opinions of his treating psychiatrists; (2) erred in determining he could return to his past work as a landscaper because the ALJ's RFC finding was based on an impermissibly vague definition of "moderate"

10

limitations and; (3) failed to mention several of Plaintiff's impairments at step-two. (Doc. 14, at 14-24).

### *The Treating Physician Rule*

Plaintiff argues the ALJ erred in evaluating the opinions of his treating psychiatrists Drs. Martin and Kilmartin. (Doc. 14, at 14). Additionally, Plaintiff argues the ALJ erred by failing to even mention the opinions of non-examining state agency psychologists Drs. Marlow and Meyer. (Doc. 14, at 22).

Drs. Martin and Kilmartin

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id*. When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Importantly, the ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id*. "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (*quoting* SSR 96-2p, 1996 WL 374188,

11

at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Plaintiff argues the ALJ did not properly apply the treating physician rule and never considered whether Drs. Martin and Kilmartin's opinions were entitled to controlling weight and further did not provide good reasons for the weight assigned as required by 20 C.F.R. § 404.1527(c)(2)-(6). (Doc. 14, at 14-18).

Beginning first with Dr. Martin, the ALJ's analysis and explanation of the weight he gave Dr. Martin's opinion does not comply with the treating physician rule. Although the ALJ's decision identifies Dr. Martin as Plaintiff's "treating physician," there is no indication that Dr. Martin's opinion was evaluated to determine whether it was entitled to controlling weight. Rather, the ALJ simply stated that "[h]er opinion is afforded partial weight, as the undersigned disagrees that the claimant is markedly limited in any area of work related function". (Tr. 55). The ALJ included no findings concerning whether Dr. Martin's opinion is well-supported by the medically acceptable evidence or consistent with the other substantial evidence in Plaintiff's case record. *See* 20 C.F.R. § 416.927(c)(2). Rather, the ALJ simply said he was rejecting Dr. Martin's opinion because he disagreed with it, therefore, the ALJ failed to provide good reasons for his conclusion. (Tr. 55); *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)).

With respect to the ALJ's analysis of Dr. Kilmartin's opinion, there is no indication it was evaluated to determine whether it was entitled to controlling weight. The ALJ states that her opinion is afforded minimal weight because it "is inconsistent with the claimant's self-reported level of function and was rendered soon after the claimant's psychiatric hospitalization in 2010." (Tr. 55). The ALJ's decision does not make clear in what way Dr. Kilmartin's opinion differs from Plaintiff's testimony and it is not clear how the opinion being rendered soon after Plaintiff's

12

psychiatric hospitalization supports giving the opinion less weight. This explanation is simply not clear enough to comply with the requirement that the ALJ provide "good reasons" for discounting a treating physician's opinion.

Defendant argues the ALJ did not err because Plaintiff testified he was able to have a close relationship with his girlfriend, take his daughter to school, perform household chores, and work "under the table" doing odd jobs for family and friends; activities which are inconsistent with disability. (Doc. 15, at 11). The Court construes this as a harmless error argument.

A violation of the treating physician rule is harmless error if: (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547.

In the paragraph immediately preceding his analysis of Drs. Martin and Kilmartin's opinions, the ALJ explains that Plaintiff had testified he did work under the table which is inconsistent with a finding of disability. (Tr. 55). Further, Plaintiff had a girlfriend, saw his daughter off to school, and was able to perform household chores. (Tr. 55). From this assessment, it is clear the ALJ rejected Drs. Martin and Kilmartin's opinions that Plaintiff was severely limited in his ability to work because he was, in fact, working. (Tr. 55). Thus, while not specifically stated by the ALJ, he discussed why the opinions were insupportable. Therefore, the ALJ's decision meets the explanatory goal of procedural safeguards in § 1527(d)(2) and his failure to comply with the regulation is harmless error.

Drs. Marlow and Meyer

Plaintiff argues the ALJ erred by failing to even mention the opinion of non-examining state agency psychologists Drs. Marlow and Meyer. (Doc. 14, at 22).

This argument is well-taken. Defendant correctly observes that during the administrative hearing the ALJ incorporated the opinions of state agency psychologists Drs. Marlow and Meyer in his first hypothetical question, which was subsequently adopted as Plaintiff's RFC. However, the ALJ failed to adequately explain the weight given to the state agency's physicians and psychologists in accordance with 20 C.F.R. § 416.927(e)(2)(ii), which states:

> When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, the administrative law judge will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions. *Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us*.

*Id.* (emphasis added); *see also* SSR 96-8p 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). In this case, the ALJ's decision does not address any of the state agency's medical or psychological opinions, the weights they were given, or the reasons for those findings. Therefore, remand is necessary in order for the ALJ to evaluate Drs. Marlow and Meyer's opinions.

*VE Testimony*

Next, Plaintiff argues the ALJ erred in finding Plaintiff could return to his past work because his RFC assessment was impermissibly vague (Doc. 14, at 19; Doc. 16, at 3). Specifically, Plaintiff maintains the ALJ's use of the term "moderate limitation" in his hypothetical questions and Plaintiff's RFC is problematic because the term, as used under the regulations, is too broad. (Doc. 14, at 20).

The ALJ questioned the VE as follows:

Hypothetical one is an individual with no exertional restrictions but does have moderate limits in work with supervisors, coworkers and the public, where moderate means there is more than a slight limitation in the area, but the individual is about to function satisfactorily (INAUDIBLE) frequently. Also moderate in maintaining attention and concentration for extended periods. Work at (INAUDIBLE) pace and adapt to change in a routine work settings [sic]. Would a person with those limitations be able to do the claimant's past relevant work?

(Tr. 79-80). The VE responded "yes" to this question.

Plaintiff cites two different cases which found error based upon the vagueness of a hypothetical question to a VE, *Scott v. Astrue*, 2012 WL 3887277 (N.D. Fla.) and *Grable v. Comm'r*, 2011 WL 2682186 (S.D. Ohio). *Scott* found that a question that was subject to multiple interpretations may not provide substantial evidence to support an ALJ's decision. 2012 WL 3887277 at *9. In *Grable*, the ALJ gave a definition of moderate that was strikingly similar to the one in the matter at hand and the Southern District of Ohio held that it was impermissibly vague. Specifically, the ALJ said moderate was "more than a slight limitation, *but the individual is still able to function satisfactorily*", and the court found error because essentially the ALJ was redefining moderate to mean "not disabled" rather than there being a range of abilities that might lead one to conclude a claimant is disabled. 2011 WL 2682186 at *8 (emphasis in original).

15

Beyond these two cases, the law is scarce regarding when a hypothetical question is impermissibly vague.

Further complicating this issue are the points in the hearing transcript where the ALJ was inaudible. (Tr. 79-80). It is difficult for this Court to determine whether a question was sufficiently clear when it is possible the VE heard clarifications that were not made part of the record. As remand is already required for failure to discuss a non-examining source, the Court declines to determine whether substantial evidence supports the ALJ's determination that Plaintiff can perform past work. In doing so, the Court makes no determination on the potential outcome of this argument.

*Step-Two Finding*

Lastly, Plaintiff alleges the ALJ erred by failing to mention several of his severe impairments, including anxiety disorder, ADHD, reading disorder, and major depression disorder. (Doc. 14, at 22-25; Doc. 16, at 4-5).

At step-two, the claimant bears the burden of establishing that he or she has a medically determinable physical or mental impairment that is severe. *See 20* C.F.R. § 416.924(c); SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). "In determining the severity of an impairment(s) at step 2 . . . evidence about the functionally limiting effects of an individual's impairment(s) must be evaluated in order to assess the effect of the impairment(s) on the individual's ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *2. An impairment must be shown by medically objective evidence and cannot be established on the basis of symptoms alone. *Id.* It is also well-settled that a diagnosis of a condition says nothing about its severity. *See Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988); *Higgs*, 880 F.2d at 863.

This Circuit has construed the ALJ's findings at step-two "as a *de minimis* hurdle in the disability determination process." *Higgs*, 880 F.3d at 862 (citations omitted)(emphasis in original). "The prevailing view . . . is that only slight abnormalities that minimally affect a claimant's ability to work can be considered non-severe." *Gaffney v. Comm'r of Soc. Sec.*, 277 F.Supp.2d 733, 735 (E.D. Mich. 2003)(*quoting Higgs*, 880 F.2d at 862). Nevertheless, an ALJ's failure to find a claimant's other conditions to be "severe" is not reversible error as the district court observed in *Norman v. Astrue*, 694 F.Supp.2d 738, 751 (N.D. Ohio 2010):

> [I]f the ALJ finds at least one impairment to be "severe." he must move on to the subsequent steps in the evaluation. He is not required to continue to analyze the remainder of claimant's impairments to determine whether they too are severe. Furthermore, the Sixth Circuit has determined that the failure to further analyze the character of other impairments while in step two is not a reversible error so long as the ALJ has already determined that at least one of the impairments is severe. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

*Norman*, 694 F.Supp.2d at 751. To the extent that Plaintiff argues the ALJ erred by failing to classify his impairments as severe or non-severe, this Court affirms the ALJ's determination. However, the failure to consider certain impairments, even if they are non-severe can be used to show an RFC is not supported by substantial evidence; the ALJ's failure to properly weigh the medical opinions has already rendered the RFC not supported by substantial evidence, therefore the Court declines to address this issue.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court affirms the Commissioner's decision at step-two and his assessment of Plaintiff's treating physicians. However, the Court finds the ALJ failed to properly assess the opinions of the non-

17

examining state agency physicians. Accordingly, this matter is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

    IT IS SO ORDERED.

                                          s/James R. Knepp, II
                                          United States Magistrate Judge